**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 25-11330

————————————————

ANTONIA ELIZABETH CARRIN,

as the personal representative of the,
estate of Raymond Marshall Carrin,

*Plaintiff-Appellant,*

*versus*

ERICA STRONG,

Warden in her individual capacity, et al.,

*Defendant,*

SHAUNA MARIE SMILEDGE,

Health Services Administrator Federal Detention Center,
Tallahassee Florida in her individual capacity,

JOSEPH JIMENEZ,

MD Staff Physician Federal Detention Center,
Tallahassee Florida in his individual capacity,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:21-cv-00486-MW-MAF

_____

Before ROSENBAUM, BRANCH, and TJOFLAT, Circuit Judges.

BRANCH, Circuit Judge:

Raymond Carrin died from complications associated with Hepatitis C while he was an inmate in federal custody. His estate[1] sued Joseph Jimenez, a doctor at Federal Detention Center Tallahassee ("FDC Tallahassee"), and Shauna Smiledge, a Health Services Administrator at FDC Tallahassee, alleging the defendants' conduct violated Carrin's Fifth and Eighth Amendment rights when they failed to provide him with adequate medical treatment as both a pretrial detainee and later an inmate. After our decision in *Johnson v. Terry*, 119 F.4th 840 (11th Cir. 2024), *cert. denied*, 146 S. Ct. 101 (2025), and our focus there on the prison's Administrative Remedy Program ("ARP"), the district court dismissed the case upon the defendants' motions for judgment on the pleadings because it found that Carrin's suit differed from the narrow scenarios that would permit a remedy under *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and its progeny, and that special factors counseled against expansion of the remedy. After careful review and with the benefit

_____

[1] For ease of reference, we refer to the estate as Carrin throughout this opinion except where the distinction is relevant.

of oral argument, we affirm the district court's decision because Carrin's claims differ from the closest *Bivens* comparison largely due to the presence of the ARP, even though Carrin's estate could not use the ARP after his death.

## I.    Background

### A.    Facts[2]

Carrin was held in federal detention from August 9, 2018, until his death on December 5, 2019. When he entered federal custody at FDC Tallahassee as a pre-trial detainee, medical personnel identified that Carrin "denied suffering from any existing painful conditions" but "was positive for Hepatitis C." Carrin was "instructed how to obtain medical, dental, and mental health care." Dr. Jimenez first evaluated Carrin on August 21, 2018, diagnosing him with "Asymptomatic Hepatitis C Virus," and ordered additional lab tests to monitor Carrin's liver function. While chronic Hepatitis C Virus (HCV) can cause cirrhosis and painful complications, it is "treatable with direct-acting antiviral ('DAA') drugs," taken orally for 8 to 12 weeks. Dr. Jimenez noted no other visible symptoms of HCV in that initial evaluation but, noting

---

[2] We recount the facts as contained in the operative first amended complaint and treat them as true, as we must. *See Perez v. Wells Fargo, N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014) ("In determining whether a party is entitled to judgment on the pleadings, we accept as true all material facts alleged in the non-moving party's pleading, and we view those facts in the light most favorable to the non-moving party.").

Carrin's elevated liver enzyme levels, ordered additional tests to "assess if treatment should start."

Carrin wanted to begin treatment immediately, and after confirming that Carrin would be at FDC Tallahassee for "at least 4 to 5 months," Dr. Jimenez indicated that the treatment plan was to "await regional non-formulary approval." Carrin followed up about the treatment plan and was told by Smiledge that he would "not be able to start [treatment] until [he] reach[ed] [his] designated institution." At the time, a pharmacist at FDC Tallahassee had prescribed DAAs to treat Carrin's HCV. Carrin's attorney wrote to the United States Attorney's Office prosecuting Carrin's case that Carrin was "in dire need of medical care but had recently been informed that FDC would not administer treatment for Hepatitis C while Carrin was a pretrial detainee."

Carrin saw another member of the FDC Tallahassee medical staff on October 15, 2018, who noted that "Carrin presented with a rash that 'appears similar to Hep C associated rashes.'" Dr. Jimenez co-signed the clinical encounter note about that observation and noted that Carrin was to see "a local GI specialist" about his HCV.

Carrin pleaded guilty on October 29, 2018, told the court of his HCV, and alleged "that FDC [Tallahassee] was refusing to provide treatment." Because Carrin was slated to testify for the government in August 2019, "it was well known that [] Carrin would remain at FDC Tallahassee" until then.

Carrin e-mailed Smiledge again on January 2, 2019, claiming that his HCV was worsening.  On January 9, another doctor stated that Carrin had the "appearance of rashes associated with liver disease" and was "interested in starting treatment and hopes to be designated [to his permanent detention facility] soon."  Carrin again "pleaded for medical treatment" during his sentencing hearing on January 15.

Immediately after returning to FDC Tallahassee post-sentencing, Carrin again e-mailed Dr. Jimenez seeking to start DAA treatment.  Smiledge replied that Carrin's case had recently been

> discussed in our Utilization Review and the question of treatment clarified.  The issue was the length of time we had to start and finish the 12 week course while not knowing if [Carrin] would be transferred and thus affect the treatment regimen.  This is a very specialized and highly monitored process which requires serial laboratory and clinical assessment.  Now that [Carrin] has been sentenced he will have the chance to begin this treatment in the designated facility with medical oversight accordingly.

Carrin inquired about the timeframe for beginning treatment, to which Smiledge replied that it would begin once Carrin reached his permanent institution.  A week later, Carrin e-mailed Smiledge complaining about "terrible back pains, and [spasms], [and] cramps" and seeking treatment.  And over the next two months, Carrin told Smiledge in "several verbal conversations" that he

needed her help obtaining treatment. That treatment was not forthcoming.

Carrin e-mailed Smiledge on March 25, 2019, complaining of swelling and "almost unbearable" discomfort. Dr. Jimenez saw Carrin the next day, noting that Carrin "appeared jaundiced and obese" and that the DAA treatment was still pending approval to begin when Carrin received his permanent facility assignment. Prison officials moved Carrin to a prison in Atlanta that same day. Carrin's counsel informed the United States Attorney's Office of the move, and the Assistant United States Attorney said that Carrin would return to Tallahassee for trial.

Medical personnel in Atlanta diagnosed Carrin with significant cirrhosis and transported him to the emergency room. After the hospital deemed Carrin medically stable, they returned him to the Atlanta prison on April 2, 2019. A prison doctor in Atlanta noted that Carrin presented a high risk for bleeding, was presenting with "abdominal ascites" (fluid accumulation), and needed liver treatment.

Carrin returned to FDC Tallahassee at some point between April 2 and May 22, 2019. Carrin e-mailed Smiledge, addressing Dr. Jimenez, on May 22, 2019, out of concern about side effects from the medication he was taking (not the DAA medication, which he had not received), but received no response. Carrin e-mailed again on June 2, informing Dr. Jimenez that Carrin's swelling and fluid retention meant he had needed to order larger shoes, and requested treatment for the swelling. Dr. Jimenez evaluated Carrin on June 7

and noted Carrin's advanced stage Hepatitis C.  On June 11, Carrin went to the emergency room because he was unable to walk due to the swelling.  The hospital was able to reduce the swelling, and Carrin returned to FDC Tallahassee on June 25.  Medical professionals at FDC Tallahassee believed Carrin needed a liver transplant.

Carrin again e-mailed Smiledge on July 5, 2019, to ask about starting DAA treatment because he was in "constant pain."  On July 13, Carrin was "weak and pale with complaints of pain" and "initially had a blank stare upon [a nurse] entering the cell room that took verbal arousing" to get him alert.  Officials transported Carrin to the hospital where doctors found that Carrin was septic and had hepatic encephalopathy.  By August 16, Carrin wrote to his mother that his condition had gone beyond the point where DAA drugs could help and he needed a liver transplant.  Carrin remained at the hospital until September 10, 2019.  Carrin planned to testify on the government's behalf in August 2019 but did not testify due to his hospitalization.

After his discharge from the hospital, Carrin returned to FDC Tallahassee.  He saw Dr. Jimenez, who noted that Carrin's HCV treatment was on hold and that Carrin would move to another facility at some point.  According to Dr. Jimenez, Carrin was not suffering from any pain.  Carrin transferred out of FDC Tallahassee on September 11, 2019, to a facility in Lexington, Kentucky.  Carrin died on December 5, 2019, from hepatic cirrhosis

8                    Opinion of the Court                    25-11330

after never receiving DAA medication.  He had never filed a formal grievance or sought relief under the prison's ARP.

## B.  Procedural History

Carrin's mother filed this suit as personal representative of his estate.[3]  She alleged four civil rights violations and sought compensatory and punitive damages under *Bivens*.  Count I alleged Smiledge exhibited deliberate indifference in failing to ensure that Carrin received necessary lifesaving treatment, in violation of Carrin's Eighth Amendment right to be free from cruel and unusual punishment.  Count II alleged Dr. Jimenez acted with deliberate indifference in failing to provide reasonable medical care, in violation of the Eighth Amendment.  Count III alleged Smiledge acted with deliberate indifference when she failed to ensure Carrin received reasonable medical care as a pretrial detainee, depriving him of his due process rights under the Fifth Amendment.  And Count IV alleged Dr. Jimenez's inadequate medical care for Carrin when he was a pretrial detainee also constituted a Fifth Amendment due process deprivation.

The parties engaged in extensive motion practice before the district court, which initially denied Smiledge's and Dr. Jimenez's motions to dismiss and motions for summary judgment.  But after

---

[3] Carrin's mother died while this appeal was pending.  A Florida state court appointed Antonia Carrin as personal representative of Raymond Carrin's estate on April 14, 2026.  Counsel for Carrin's estate filed a "Notice to Amend Caption to Substitute a Party" on June 17, 2026, which we construe as a motion to substitute a party and grant.  *See* Fed. R. App. P. 43.

we issued our opinion in *Johnson*, Smiledge and Dr. Jimenez moved for leave to file a motion for judgment on the pleadings, which the court permitted.

The district court granted the defendants' motions for judgment on the pleadings. After briefly describing the history of *Bivens* actions, the court applied the relevant two-step analysis to determine whether a *Bivens* remedy was available to Carrin for the Fifth and Eighth Amendment claims: (1) determining whether "the plaintiff's situation is . . . meaningfully different" from the facts of the three recognized *Bivens* action cases[4], and (2) if so, analyzing whether there are any "special factors" that counsel against a *Bivens* expansion—in which case the plaintiff's claim fails.

Thus, at the first step, the court compared Carrin's situation to the Eighth Amendment claims brought in *Carlson v. Green*, 446 U.S. 14 (1980), the most relevant potential case recognizing a *Bivens* action. It found that Carrin's Fifth Amendment claims presented a new context from *Carlson*. And because the ARP provided an alternative remedial structure federal prisons use to review issues prisoners raise about their confinement, the ARP's existence had "dispositive weight" in distinguishing Carrin's Eighth Amendment claims from *Carlson*.

The district court then moved to the second step, where it determined that Carrin's Fifth and Eighth Amendment claims

---

[4] *Bivens*, 403 U.S. 388 (1971); *Davis v. Passman*, 442 U.S. 228 (1979); *Carlson v. Green*, 446 U.S. 14 (1980).

10                    Opinion of the Court                    25-11330

failed because of the presence of the ARP.   The prison's ARP was both a "meaningful difference" under step one and a "special factor that prevents a court from expanding the *Bivens* remedy" under step two because the ARP provided a process to address the alleged harms Carrin suffered as a pretrial detainee and an inmate. Accordingly, the ARP's existence counseled against expanding *Bivens* in step two for both the Fifth and Eighth Amendment claims. The court noted that Carrin could have used the ARP process because he was in custody for over a year as his health gradually declined; therefore, he had time to use the ARP to address his concerns but did not.   Accordingly, the district court concluded that the availability of the ARP foreclosed the availability of a *Bivens* remedy, and it dismissed the case.   Carrin timely appealed.

## II.   Discussion[5]

Carrin argues on appeal that he successfully asserted a *Bivens* action because the Eighth Amendment claims arise in the same context as *Carlson* and therefore should not trigger the special factors analysis.   In Carrin's view, both *Carlson* and this case involve

---

[5] We review the district court's grant of a motion for judgment on the pleadings *de novo*.   *Perez*, 774 F.3d at 1335.   "Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law."   *Id.* (quotation omitted).   We are bound to follow a prior panel's holding unless and until it is "overruled or undermined to the point of abrogation" by either the Supreme Court or this Court sitting *en banc*.   *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1223 (11th Cir. 2022) (quotation omitted).

prison officials' deliberate indifference to an inmate's need for treatment of a serious medical condition.  But even if the Eighth Amendment claims arise in a new context, the estate argues that because it cannot use the ARP following Carrin's death, we should not consider the ARP's existence as a special factor distinguishing this case from *Carlson*.  Carrin also maintains that the Fifth Amendment claims should proceed, even if they differ from *Carlson,* because there are no special factors weighing against authorization of the claim.

We begin our discussion with *Bivens* itself, through which the Supreme Court ushered in an implied right of action for damages (in the absence of any statutory authorization) against federal officials for certain constitutional violations; in that case, a violation of an individual's Fourth Amendment rights.  *See Bivens*, 403 U.S. at 395–97.  A few years later, the Court extended *Bivens*, recognizing an implied cause of action for a Fifth Amendment due process claim in a woman's sex discrimination suit against her former employer, a United States Congressman.  *Davis*, 442 U.S. at 244–48.  The next year, the Supreme Court again extended *Bivens* in *Carlson*.

We pause to describe *Carlson* in detail as it will serve as our comparator here.  In *Carlson*, a mother filed suit on behalf of her son's estate alleging her son died because federal prison officials "violated his due process, equal protection, and Eighth Amendment rights" when they failed to provide medical attention for hours after her son suffered an asthma attack.  446 U.S. at 16 &

n.1.   Compounding the harm, officials "administered contra-indicated drugs which made his attack more severe, attempted to use a respirator known to be inoperative which further impeded his breathing, and delayed for too long a time his transfer to an outside hospital."    *Id.*    The Court characterized *Bivens* as "establish[ing] that the victims of a federal agent's constitutional violation have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right."    *Id.* at 18.   The Court recognized two exceptions to this general principle bestowing such a cause of action.   *Id.* at 18–19.

> The first is when defendants demonstrate special fac-tors counselling hesitation in the absence of affirma-tive action by Congress.   The second is when defend-ants show that Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective.

*Id.* (emphasis in original) (citation and quotations omitted).   The Court explained that Carlson's case "involve[d] no special factors counselling hesitation in the absence of affirmative action by Congress."   *Id.* at 19.   Nor was there an "explicit congressional declaration that persons injured by federal officers' violations of the Eighth Amendment may not recover money damages from the agents but must be remitted to another remedy, equally effective in the view of Congress."   *Id.*   Thus, the Supreme Court determined

that the implied cause of action for the Eighth Amendment deliberate indifference claim could proceed.[6] *Id.* at 25.

The Supreme Court has not recognized another *Bivens* application in the more than four decades since *Carlson* and has declined to do so on at least a dozen occasions. *See Johnson*, 119 F.4th at 847–48 (collecting cases). By 2017, the Supreme Court had adopted a dim view of implied causes of action against federal officers and in turn strongly disfavored applying *Bivens* to any new context or new category of defendants. *See Ziglar v. Abbasi*, 582 U.S. 120, 132–35 (2017). In *Ziglar*, the Court observed that *Bivens* rested on the assumption that, where a statute created a right but was silent as to remedy, it was a proper for a court to imply a cause of action and "provide for such remedies as [were] necessary to make effective a statute's purpose."[7] *Id.* at 132 (quotations omitted). But the Court explained that recognition of implied causes of action often violated separation-of-powers principles because it was for

---

[6] The Court recognized an implied cause of action even though another remedy, the Federal Tort Claims Act ("FTCA"), existed. *Carlson*, 446 U.S. at 19. While the FTCA pre-dated *Bivens*, Congress amended the FTCA post-*Bivens* as a "parallel, complementary cause[] of action." *Id.* at 19–20.

[7] The Court also explained that it decided *Bivens* in 1971 against the backdrop of 42 U.S.C. § 1983, which Congress enacted in 1871 to provide a cause of action for money damages against *state* officials who violate constitutional rights. *Ziglar*, 582 U.S. at 130–31. Congress has not created a similar statute for *federal* officials who violate constitutional rights. *See id.* at 130. Accordingly, we analyze whether recognizing an implied cause of action against the federal officials involved here is appropriate given our more recent controlling precedents.

Congress, not the courts, to create causes of action. *Id.* at 132–34. Thus, the Court noted that *Bivens* stood on shaky ground:

> in light of the changes to the Court's general approach to recognizing implied damages remedies, it is possible that the analysis in the Court's three *Bivens* cases might have been different if they were decided today. To be sure, no congressional enactment has disapproved of these decisions. And it must be understood that this opinion is not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose. *Bivens* does vindicate the Constitution by allowing some redress for injuries, and it provides instruction and guidance to federal law enforcement officers going forward. The settled law of *Bivens* in this common and recurrent sphere of law enforcement, and the undoubted reliance upon it as a fixed principle in the law, are powerful reasons to retain it in that sphere.

*Id.* at 134. So *Bivens*, *Davis*, and *Carlson* remain good law, but "the Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Id.* at 135. Thus, the Court has consistently and repeatedly "refused to extend *Bivens* to any new context or new category of defendants." *Id.* (quotation omitted). Accordingly, for a *Bivens* remedy to be available, the case in question must involve the narrow factual contexts in *Bivens*, *Davis*, or *Carlson*. *See id.*

25-11330                Opinion of the Court                15

To determine whether a *Bivens* remedy is available, we use a two-step test as prescribed by the Supreme Court. "First, we ask whether the case presents a new *Bivens* context—*i.e.*, is it 'meaningfully' different from the three cases in which the Court has implied a damages action." *Egbert v. Boule*, 596 U.S. 482, 492 (2022) (alteration adopted) (quotation and citation omitted). And "[s]econd, if a claim arises in a new context, a *Bivens* remedy is unavailable if there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed." *Id.* (quotation and citation omitted).

As to the first step, meaningful differences between cases may exist if the new case implicates a different constitutional right or if the factual context surrounding the claim varies from the existing cases. *Ziglar*, 582 U.S. at 139–40. Importantly, we "look at whether the two cases have *any* relevant differences, not whether they are mostly the same." *Johnson*, 119 F.4th at 859 (emphasis in original).

If the claims arise in a new context, then, at the second step, we examine whether there are any special factors that would cause the court to hesitate before extending *Bivens* to the new context. *Id.* One such special factor we must consider is whether "Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure."[8]  *Egbert*, 596 U.S. at 493

---

[8] When "Congress has actively legislated in the area of prisoner litigation but has not enacted a statutory cause of action for money damages," the Supreme

(quotation omitted). The remedial structure must simply exist; it need not provide an equivalent remedy as *Bivens* and its progeny provide: "The existence of such alternative remedial procedures counsels against allowing *Bivens* suits even if such procedures are not as effective as an individual damages remedy." *Goldey v. Fields*, 606 U.S. 942, 944–45 (2025) (quotation omitted).

We applied the Supreme Court's two-step test for analyzing *Bivens* claims recently in *Johnson*. There, Johnson, a federal prisoner, sought money damages under a *Bivens*-style claim alleging, as relevant here, that prison officials were "deliberately indifferent to his serious medical needs" by providing inadequate care for his foot and hand injuries. *Johnson*, 119 F.4th at 843–45.

At the first step, we held that to the extent Johnson's claims implicated the Fifth Amendment, such claims presented "a new *Bivens* context" that differed from the Supreme Court's three *Bivens* cases. *Id.* at 852, 857–58. And while Johnson's Eighth Amendment claims generally matched those brought in *Carlson*, we found them distinguishable from *Carlson* because in *Carlson* "the Court did not consider whether there were alternative remedies" as required under the current prevailing framework. *Id.* at 858; *see also Egbert*, 596 U.S. at 501.

---

Court has explained that the omission "counsel[s] against recognizing an implied *Bivens* cause of action" for prison litigation that would go beyond what Congress has done. *Goldey*, 606 U.S. at 944. "Even a single sound reason to defer to Congress is enough to require a court to refrain from creating [an implied cause of action]." *Egbert*, 596 U.S. at 491 (quotation omitted).

At the second step, we explained that a special factor precluded extending *Bivens* to all of Johnson's claims because an "alternative remedy exist[ed] that Congress or the Executive believed to be sufficient to remedy the type of harm" Johnson alleged, and that alternative remedial scheme was the ARP. *Johnson*, 119 F.4th at 858, 860–62. We concluded that "the existence of a grievance procedure is a special factor that by itself is enough to rule out inferring a *Bivens* cause of action," and that "an alternative remedy need not satisfactorily address every plaintiff's complaints to be sufficient." *Id.* at 861–62; *see Egbert*, 596 U.S. at 493. We also elaborated on how the analytical framework has changed since the Supreme Court decided *Carlson*:

> In *Carlson*, the Court asked whether there were alternative remedies which Congress explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective, and it found that the Federal Tort Claims Act did not meet that standard.
>
> Now as part of the special factors analysis that we consider we ask whether *any* alternative remedy exists that Congress or the Executive believed to be sufficient to remedy the type of harm [the plaintiff] allegedly suffered.

*Johnson*, 119 F.4th at 858 (emphasis in original) (alteration adopted) (citations and quotations omitted). In other words, the onus is on the coequal legislative and executive branches, not the courts, to determine the appropriate vehicle for remedying constitutional

wrongs.  *See Egbert*, 596 U.S. at 493.  We therefore declined to recognize a *Bivens* cause of action in Johnson's case.  *Johnson*, 119 F.4th at 861–62.

We now apply this framework to Carrin's claims.  At the first step, the question is whether Carrin's claims are meaningfully different from those in *Carlson*.  Carrin concedes that the Fifth Amendment claims implicate a different constitutional right than the right in *Carlson* and are thus meaningfully different under step one.

The Eighth Amendment claims fare little better, even though Carrin argues that the claims alleged here, denial of necessary medical care for a serious medical condition, are the same as those in *Carlson*.  That description paints with too broad a brush.  *See Johnson*, 119 F.4th at 858 ("While Johnson's other deliberate indifference claims arise under the Eighth Amendment as the claim did in *Carlson*, that is not enough to prevent the context of those claims from being a new one for *Bivens* purposes.").  We do not ask whether claims are "mostly the same" as those in *Carlson*; if the claims have "*any* relevant differences," "even small differences" like the "severity, type, and treatment" of the injury, we must find the claims arise in a new context.  *Id*. at 859.  *Carlson* involved medical treatment failures over the course of a single day. 466 U.S. at 16 n.1.  Carrin's disease, on the other hand, progressed over the course of a year and required multiple emergency hospital visits.  Further, the alleged lack of medical care was the failure to provide Carrin's approved DAA treatment at any point between

Carrin's initial prison intake in August 2018 and his death in December 2019.  That treatment (or lack thereof), which would have taken 12 uninterrupted weeks to complete and careful monitoring, is distinguishable from the *Carlson* prison staff's administration of a contra-indicated drug and a faulty respirator in response to an acute asthma attack over a few hours.  Thus, Carrin's Eighth Amendment claims arise in a new context from the existing *Bivens* cases.

And even if the claims were not distinguishable based on the "severity, type, and treatment" of the injuries, they still represent a meaningfully different context from *Carlson* because of the remedies available.  *Johnson*, 119 F.4th at 858–59.  As we observed in *Johnson*, the Court in *Carlson* considered whether the Federal Tort Claims Act was a "substitute" remedy "equally effective" in Congress's view.  *Id.* at 858.  But that is not "the current alternative remedies analysis."  *Id.* at 859.  After *Johnson*, the presence of "*any* alternative remedy," regardless of effectiveness, means the "context of these claims is different from the context of the claim in *Carlson*."  *Id.* at 858 (emphasis in original).  Therefore, both Carrin's Fifth Amendment and Eighth Amendment claims arise in a new context, pushing our analysis to step two.  *Id.* at 858–59.

We thus turn to step two and ask whether any special factors counsel against expanding *Bivens* to Carrin's Fifth and Eighth Amendment claims.  The ARP serves as such a special factor.  As we noted previously, the existence of a congressionally created (or

Executive created, as authorized by Congress)[9] alternative remedial process designed to address the harm alleged is a special factor that counsels against extending the *Bivens* remedy to a new context. *Johnson*, 119 F.4th at 860; *see Ziglar*, 582 U.S. at 137. We need not, and cannot, ask whether the remedy Congress or the Executive has chosen is the best policy choice. *See Goldey*, 606 U.S. at 944–45; *see also Johnson*, 119 F.4th at 860 (explaining that when analyzing alternative remedies, "[i]t's not our place to second-guess th[e] calibration" that Congress or the Executive made in enacting them (quotation omitted)). We also cannot "look at the adequacy or efficacy of the alternative remedy in general or in relation to a specific plaintiff." *Johnson*, 119 F.4th at 860. As in *Johnson*, an alternative remedy to Carrin's suit exists here: the ARP. The ARP allows for "formal review of an issue relating to any aspect" of a prisoner's confinement. 28 C.F.R. § 542.10. It allows for "allegedly unconstitutional actions and policies [to] be brought to the attention of [federal prison officials] and prevented from recurring." *Malesko*, 534 U.S. at 74. Carrin alleges constitutional violations by federal officials, the same harms the ARP addresses.

---

[9] *See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("[The ARP] provides [a] means through which allegedly unconstitutional actions and policies can be brought to the attention of the [Federal Bureau of Prisons] and prevented from recurring."); *see also* 28 C.F.R. § 542.10 ("The purpose of the [ARP] is to allow an inmate to seek formal review of an issue relating to any aspect of [his] own confinement."); 18 U.S.C. § 4001(b)(1) ("The control and management of Federal penal and correctional institutions . . . shall be vested in the Attorney General, who shall promulgate rules for the government thereof.").

Thus, we cannot recognize an implied cause of action beyond what is statutorily authorized.

Nevertheless, the estate argues that the ARP is not an alternative remedy because the estate itself cannot access the ARP following Carrin's death, and we therefore should not consider the ARP's existence at step two of the analysis. As we explained above, however, whether the ARP is accessible or otherwise adequate to redress Carrin's grievances is, for better or worse, irrelevant to our analysis. *Id.* (explaining that under the Supreme Court's existing framework, "[t]he only consideration is whether there is a remedial process in place that is intended to redress the kind of harm faced by those like the plaintiff"). The ARP is the "safeguard[] to prevent constitutional violations [like those alleged by Carrin] from recurring," even if it would not vindicate an estate seeking compensation. *See id.* (quotations omitted). And unlike in *Carlson*, where the inmate suffered an asthma attack and died the same day, Carrin had over a year to pursue the ARP process and seek redress for his lack of medical care but did not do so. The ARP's existence thus provides the "single sound reason" not to recognize an implied cause of action here. *See Egbert*, 596 U.S. at 491 (quotation omitted); *see also Johnson*, 119 F.4th at 861 ("The Supreme Court has instructed us that the existence of a grievance procedure is a special factor that by itself is enough to rule out inferring a *Bivens* cause of action.").

Accordingly, Carrin's *Bivens* claims fail.

### III.                Conclusion

The district court did not err in dismissing the complaint upon the defendants' motions for judgment on the pleadings because the context of Carrin's claims was meaningfully different from those in *Carlson* and the ARP provided a special factor counseling against expansion of *Bivens* remedies.  We affirm the dismissal.

**AFFIRMED**.

25-11330                    ROSENBAUM, J., Concurring                    1

ROSENBAUM, Circuit Judge, Concurring:

I agree with the Majority Opinion that *Johnson v. Terry*, 119 F.4th 840 (11th Cir. 2024), *cert. denied*, 146 S. Ct. 101 (2025), and the Supreme Court precedent on which that opinion is based, require us to affirm the district court's decision dismissing Antonia Carrin's case. I write separately because under governing precedent, "*any* alternative remedy . . . that Congress or the Executive believed to be sufficient to remedy the type of harm [the plaintiff] allegedly suffered," *Johnson,* 119 F.4th at 858 (emphasis in original) (alteration adopted) (citations and quotations omitted), eliminates the possibility of a *Bivens*[1] remedy. And that creates a real potential for the government to violate constitutional rights with impunity.

Here's how. As counsel for the individually named defendants admitted at oral argument, the medical treatment Raymond Carrin needed in this case—direct-acting antiviral drugs for Hepatitis C, taken orally for 8 to 12 weeks—is very costly. Indeed, the treatment costs tens of thousands of dollars. Meanwhile, as this case's tragic facts show, delayed treatment can moot the need to administer these antivirals, saving the prison a lot of money. So a severely misguided prison official could adopt delay as a cost-saving mechanism.[2] And neither a prisoner suffering from

---

[1] *Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

[2] To be clear, I do not suggest that happened here. I have seen no evidence to that effect in this record. Still, it is unforgivable that the federal prison system failed for a **sixteen-month** period to administer a known cure for Raymond Carrin's fatal illness and instead let him die of it.

an illness requiring expensive medication nor that prisoner's family would have any effective recourse.

That's so because controlling precedent says that *"any* alternative remedy . . . that Congress or the Executive believed to be sufficient to remedy the type of harm [the plaintiff] allegedly suffered," *Johnson,* 119 F.4th at 858 (emphasis in original) (alteration adopted) (citations and quotations omitted), eliminates the possibility of a *Bivens* remedy. And we've explained that "Congress through the Executive Branch put the BOP [Bureau of Prisons] administrative remedy program [("ARP")] in place to address prisoner grievances, including those involving alleged constitutional violations." *Id.* at 861. In other words, the ARP's existence rules out *Bivens* remedies in the prison context.

Never mind that the ARP doesn't authorize damages, so a federal-prison official could decide it's cheaper not to provide medical treatment and face no consequences. Under controlling precedent, the ARP is enough for a federal-prison official to be able to violate the Eighth (and in cases of pretrial detention, the Fifth) Amendment with impunity.

But under *Bivens*, "the focus is whether the Government has put in place safeguards to prevent constitutional violations from recurring." *Egbert v. Boule*, 596 U.S. 482, 498 (2022) (cleaned up). And it's hard to see how the ARP, which does not authorize damages for violation of a prisoner's Eighth Amendment rights resulting from the failure to provide necessary care to save prisons

25-11330                ROSENBAUM, J., Concurring                3

money, could "deter[] the unconstitutional acts of individual officers," *id.* at 498.

If constitutional rights are to be worth the paper they're written on, they must be able to be vindicated in a meaningful way. Most respectfully, the current legal framework for vitiating federal violations of constitutional rights does not appear to ensure that.